Filed 5/29/13  P. v. Pena CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL GEORGE PEÑA,<br><br>    Defendant and Appellant. | H037550<br>(Santa Clara County<br>Super. Ct. No. CC945872) |

Defendant Daniel George Peña is serving a prison term of 32 years to life for attempted murder (Pen. Code, §§ 187, subd. (a), 664)[1] accompanied by firearm use resulting in great bodily injury (§ 12022.53, subds. (d), (e)(1)).  On appeal, he claims that the trial court erred by not instructing the jury to consider the less serious offenses of voluntary manslaughter and attempted voluntary manslaughter.  He also claims that counsel rendered ineffective assistance of counsel when he failed to ask the court to instruct on completed and attempted voluntary manslaughter.

The claims are without merit and we will affirm the judgment.  Defendant has also filed a petition for writ of habeas corpus, which we have ordered considered with this appeal.  In it, he makes an additional claim of ineffective assistance of counsel arising

---

[1] All statutory references are to the Penal Code.

from the jury trial. We have disposed of the petition by separate order filed this date. (Cal. Rules of Court, rule 8.387(b)(2)(B).)

PROCEDURAL BACKGROUND

A first amended information charged defendant with murdering Álvaro Galindo (§ 187) and attempting to murder Jeremy Luna (§§ 187, 664). It alleged that the attempted murder was deliberate and premeditated (see § 664, subd. (a) [providing for a life sentence with the possibility of parole if an attempted murder is willful, deliberate, and premeditated]) and that defendant committed an offense to benefit a criminal street gang (§ 186.22, subds. (b)(1)(C) [pertaining to the murder charge], (b)(5) [pertaining to the attempted murder charge]). It also alleged that a principal in the charged offenses intentionally discharged a firearm, causing great bodily injury to a person other than an accomplice. (§ 12022.53, subds. (d), (e)(1).)

Defendant was tried by jury. The jury found him guilty of attempted murder and found true the gang and firearm-use allegations, but deadlocked on the murder charge and whether the attempted murder was deliberate and premeditated. The trial court declared a mistrial on the deadlocked matters and dismissed the jury. The court sentenced defendant to the middle term of seven years for the unpremeditated attempted murder (§§ 190, subd. (a), 2d par., 664, subd. (a)) consecutive to 25 years to life for the firearm-use enhancement (§ 12022.53, subd. (d)). The court stayed sentencing on the gang-benefit enhancement.

FACTS

Although defendant was charged with Galindo's murder, in fact defendant and Galindo were comrades-in-arms in the Sureño criminal street gang. Galindo was actually killed by a member of the Norteño criminal street gang during a confrontation. The prosecution's theory was that defendant committed murder under the provocative act doctrine, "a descriptive term referring to a subset of intervening-act homicides in which the defendant's conduct provokes an intermediary's violent response that causes

2

someone's death." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 649, fn. 2.) As noted, the jury could not agree on this charge and found defendant guilty only of attempted murder.

The underlying conduct relating to this case occurred on April 12, 2009. On that date, defendant and Galindo decided to retaliate for an incident in 2008 in which a group of Norteños attacked defendant as he was eating at a taquería. They drove to an apartment complex known to contain Norteño residents and a shootout ensued. Galindo wounded one of the Norteños before another Norteño killed him. Defendant, who had been walking next to Galindo when the shootout started, fled when he heard the sound of a gun being cocked. The parties do not point us to any evidence that defendant was armed during this incident. A San José police sergeant testified that defendant told him he had not brought a gun to the showdown, and defendant insisted at trial that he had never pulled a gun or knife on anyone.

Defendant testified that on the day of the shootout Galindo called him and told him that he had driven past the taquería and seen people who looked like the assailants from the 2008 incident. Galindo asked defendant whether he wanted to fight them. Defendant said yes. He had remained angry about the 2008 attack on him.

Defendant further testified that Galindo picked him up in his car. In his testimony, he denied knowing that Galindo was armed. (On cross-examination the prosecutor would challenge defendant's lack of knowledge; we will provide more detail in our discussion of defendant's ineffective assistance of counsel claim, *post*, p. 9.) They parked and walked up a driveway to a place where people were present. Defendant and Galindo initially pretended to be Norteños and asked what gang the people in the driveway belonged to. The men responded that they were neither Norteños nor Sureños. Defendant and Galindo then asked them to lift up their shirts, checking their gang affiliation, and defendant noticed that some of them were wearing red or red-accented items, suggesting that they were members of the Norteño criminal street gang.

3

At this point, defendant testified, he saw an older woman coming from her garage and, accordingly, decided to leave the area out of respect for her. As he and Galindo walked toward the car, he saw two people approach rapidly, heard a gun being cocked, and said to Galindo, "*vámonos*," i.e., "Let's go," and ducked behind a car. Gunfire erupted, with perhaps eight rounds discharged. Jeremy Luna's prior testimony, which was read to the jury, implied that he and Galindo confronted each other. Galindo shot and wounded Luna, a Norteño. Then, as established by other evidence, someone shot and killed Galindo.

About two months later, a San José police officer searched a place where defendant was living after the incident. She found a camera containing photographs of defendant, defendant's California driver license, and blue clothing and recorded media that suggested a link to the Sureños. She also found notebooks filled with Sureño-identified profanity-laced references to Norteños.

## DISCUSSION

I. *Failing to Instruct on Lesser Included Offense of Voluntary Manslaughter*

Defendant claims that the trial court infringed on his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution, and erred under state law, by failing to instruct on voluntary manslaughter, a lesser included offense to murder, and on attempted voluntary manslaughter, a lesser included offense to voluntary manslaughter and attempted murder.

A. *Background*

On July 12, 2011, the trial court and parties discussed the jury instructions to be given. The prosecutor mentioned that the court and counsel had an in camera conference about the instructions on the preceding Friday and that the current proceeding was a "settlement conference."

Concerned to ensure that instructional decisions were placed on the record, the trial court asked the parties to recite for the record "[a]ny others that you want to

4

comment on." In particular, the court asked about "the concept that we discussed [about] the possibility of lessers . . . ," i.e., lesser included offenses. "[N]one were included," the court noted.

Defense counsel stated: "I did ponder it, of course, . . . and I wondered whether voluntary manslaughter was an appropriate lesser to be included.

"Frankly, I thought it would be a stretch to find the heat of passion, sudden quarrel evidence that would support that.

"And for the lack of any evidence to support it and also for tactical reasons, I did not request any lessers."

B. *Legal Principles*

" ' "Murder is the unlawful killing of a human being with malice aforethought. [Citation.] A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. [Citation.]" ' " (*People v. Moye* (2009) 47 Cal.4th 537, 549.) Voluntary manslaughter is one "of three kinds" (Pen. Code, § 192) of the offense of manslaughter. It is an unlawful killing that occurs "upon a sudden quarrel or heat of passion." (*Ibid.*)

" ' "Manslaughter . . . is a lesser included offense of murder." [Citation.] "Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation.' " [Citation.] 'The " 'heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances . . . .' " [Citation.]' [Citation.] ' "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim." [Citation.] "[T]he victim must taunt the defendant or otherwise initiate the provocation." ' " (*People v. Souza* (2012) 54 Cal.4th 90, 116.)

5

" '[T]he fundamental [part] of the inquiry [into whether provocation has negated the malice element of murder and would justify a voluntary manslaughter verdict] is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and never, of course, the passion for revenge—to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*People v. Rich* (1988) 45 Cal.3d 1036, 1112, first bracketed word added here, second instance of bracketed material in original, italics deleted.)

Heat of passion or sudden quarrel is not the only basis on which a verdict of voluntary manslaughter may be rendered. Imperfect self-defense is another basis. "For purposes of voluntary manslaughter, an intentional unlawful killing can lack malice when the defendant . . . acted under '[an] unreasonable but good faith belief in having to act in self-defense.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 832-833.)

### C.   *Analysis*

Because defense counsel invited any error, defendant's claim is unavailing.

Defense counsel did not discuss on the record whether he had also considered asking for a voluntary manslaughter instruction based on imperfect self-defense, i.e., a lethal act based on an unreasonable but good faith belief in the need to defend oneself or another person (see *People v. Randle* (2005) 35 Cal.4th 987, 997 ["one who kills in imperfect defense of others—in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury—is guilty only of manslaughter"], overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1201). Accordingly, on July 6, 2012, after defendant had filed his appeal, this court ordered the trial court and parties to "undertake preparation of a settled statement with respect to any statements by defense counsel regarding his intent to pursue the theories of self-defense or defense of others."

On July 23, 2012, the trial court and parties held a hearing to address this court's order. The court invited defense counsel to address "your intent to pursue the theories of self-defense or defense of others."

Counsel stated: "I recall at the time of trial we met in chambers. And by 'we,' I mean the Court and counsel met in chambers to discuss what jury instructions would be given. And there was a list . . . of all the possible jury instructions that could have been given, and Court and counsel went through each of those to see which were appropriate, which were not, which was to be given, and which would not be given.

"As to the self-defense and defense of others instructions, when we came to that series of instructions, I recall saying something to the effect that 'This is not a self-defense case. I'm not requesting these instructions.' And both Court and counsel agreed that that was, in fact, the case. And we moved on.

"I did not, at the time, articulate any particular reason for it other than the fact that there was no substantial evidence at all to indicate that those instructions would be in any way appropriate. I didn't see the case as a self-defense case. I didn't plan to argue it as a self-defense case or defense of others. And so . . . those instructions were simply gone over and not requested.

"And, of course, later, as the record would reveal, when the Court asked on the record whether there were any instructions that were not given . . . that were, in fact, requested, I did not respond." "And that's the way I recall it."

"The doctrine of invited error is limited to those situations where it is clear that counsel acted for tactical reasons or where there is a 'clearly implied tactical purpose' to counsel's actions." (*People v. Guerrero* (2007) 155 Cal.App.4th 1264, 1267, fn. 3.)

" 'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . . [I]t also must be clear that counsel acted for tactical reasons and

not out of ignorance or mistake.' In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.)

"[C]ounsel's affirmative action, as opposed to mere acquiescence," may imply "a tactical purpose." (*People v. Moon* (2005) 37 Cal.4th 1, 28.)

As noted, at the July 12, 2011 court session, defense counsel did not mention self-defense but only heat of passion or sudden quarrel. At the July 23, 2012, post-trial hearing precipitated by this court's order for a settled statement, defense counsel recalled having stated during the in-chambers conference that occurred during the trial that he had considered and rejected a self-defense theory as well. At the earlier session in open court, counsel mentioned having tactical reasons for not seeking voluntary manslaughter instructions. It is implicit from his statements at the later hearing that tactical reasons informed his decision not to pursue a self-defense strategy (see *People v. Moon*, *supra*, 37 Cal.4th at p. 28), just as he had expressly stated at the July 12, 2011 court session that tactical reasons informed his decision not to pursue a voluntary manslaughter instruction on a heat of passion or sudden quarrel theory.

We express no opinion whether the trial court erred in failing to instruct on voluntary manslaughter, because even if it did, the error was invited and defendant cannot complain of it on appeal. The same is true of attempted voluntary manslaughter. In general, an attempt is a lesser included offense of a completed crime (*People v. Bailey* (2012) 54 Cal.4th 740, 753); additionally, it has been held that voluntary manslaughter is a lesser included offense to attempted murder (*People v. Van Ronk* (1985) 171 Cal.App.3d 818, 820, 824-825). Counsel had his tactical reasons for not seeking instructions on any lesser included offenses. Thus, we reject defendant's claims that the trial court failed to instruct on lesser included offenses.

8

II.     *Ineffective Assistance of Counsel*

Defendant also claims that he received ineffective assistance of counsel because counsel failed to seek voluntary manslaughter and attempted voluntary manslaughter instructions.  (He also argues that if we find forfeited his instructional-error claims, then counsel's failure to preserve such claims for review was ineffective.  He does not further discuss this notion, however, and in any event his claims of error were preserved for review under sections 1259 and 1469.)

Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the effective assistance of counsel.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.)  "The ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result."  (*Ibid.*)  A claim of ineffective assistance of counsel in violation of the Sixth Amendment entails deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of an adverse effect on the outcome.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694.)  The *Strickland* standards also apply to defendant's claim under article I, section 15 of the California Constitution.  (E.g., *People v. Waidla* (2000) 22 Cal.4th 690, 718.)

It is settled law that " ' "trial counsel's tactical decisions are accorded substantial deference [citations], [and] . . . [a] reviewing court will not second-guess trial counsel's reasonable tactical decisions." ' "  (*People v. Maldonado* (2009) 172 Cal.App.4th 89, 97.)  Defendant recognizes this principle but argues that there could be nothing reasonable about failing to seek instructions on voluntary manslaughter and attempted voluntary manslaughter inasmuch as there would be nothing to lose by doing so.

In fact, however, there could.  The evidence before the jury was that defendant and Galindo were looking for a fight with Norteños who they believed might have assaulted defendant in 2008.  In his testimony, defendant denied knowing that Galindo was armed,

but on cross-examination the prosecutor challenged this assertion, asking defendant whether he really meant to say he did not know that Galindo, who defendant acknowledged to be a good friend, had been using the gun regularly, including firing shots at people on a porch on the night before he was killed, shooting at people who were standing on a street corner about two weeks before that, and leaving a man paralyzed by gunfire in 2009. Counsel could reasonably have concluded that this cross-examination made defendant's denial lack credibility, allowing the jury, instead, to reason that defendant embarked on a hunt for Norteños with a comrade-in-arms and good friend who he knew to be armed. These possibilities could make an argument for voluntary manslaughter based on heat of passion, sudden quarrel, or imperfect self-defense look like an effort to massage the facts beyond any reasonable interpretation—it would, as defense counsel told the trial court, be a "stretch." Counsel could also have reasonably concluded that the jury would find it obvious that defendant and Galindo were bent on revenge, which foreclosed a voluntary manslaughter theory. (*People v. Rich*, *supra*, 45 Cal.3d at p. 1112.)

Instead, at closing argument, defense counsel argued vigorously that his client did not shoot anyone or intend that anyone be shot, and basically found himself in a more serious situation than he anticipated, "more than they bargained for." Then, counsel argued, his client attempted to withdraw from the situation before the gunfire erupted. Counsel could reasonably have concluded that arguing for voluntary manslaughter, whether attempted or completed, and asking for instructions on those theories, could make the jury less receptive to his lack-of-intent and effort-to-withdraw arguments. And counsel could reasonably have decided that relying on voluntary manslaughter, even if he succeeded in persuading the trial court to instruct on it, would have allowed the prosecutor to undermine his case by highlighting the evidence of revenge. Indeed,

10

counsel acknowledged the revenge factor at closing argument: "He wanted to get revenge," counsel said of his client. "Nobody has disputed that."[2] As noted earlier, voluntary manslaughter cannot be based on revenge. Counsel's closing argument explicitly acknowledging the revenge factor at play indicates a tactical decision to base his defense on a theory other than the lesser included offenses of voluntary manslaughter, whether by self-defense, imperfect self-defense, heat of passion, or sudden quarrel.

Through his advocacy, defense counsel succeeded in getting the jury to deadlock on the more serious charge of murder and on the allegation that the attempted murder was premeditated. We are generally disinclined to second-guess counsel's tactics at trial, and all the less so when they brought about partial success in the face of very difficult facts. We therefore find no ineffective assistance of counsel.

---

[2] "We have repeatedly recognized that sensible concessions are an acceptable and often necessary tactic." (*People v. Gamache* (2010) 48 Cal.4th 347, 392.) Depending on the state of the evidence, "candor may be the most effective tool available to counsel." (*People v. Mayfield* (1993) 5 Cal.4th 142, 177.)

## DISPOSITION

The judgment is affirmed.

_____
Márquez, J.

WE CONCUR:


_____
Rushing, P. J.


_____
Grover, J.